JAMES L. ARCHER et al., Appellees, v. J. S. COMPTON, Inc. et al., Appellants; CITY OF WEST DES MOINES, Appellee; HOWARD M. HALL et ux., Interveners-Appellees.

No. 47081.

Fountain, Bridges, Lundy & Stephenson and Stipp, Perry, Bannister & Ahlers, all of Des Moines, for J. S. Compton, Inc., appellants.

Guy A. Miller, of Des Moines, for plaintiffs-appellees.

Connolly, O'Malley & McNutt, of Des Moines, for City of West Des Moines, defendant-appellee.

Herrick, Sloan & Langdon, of Des Moines, for interveners-appellees.

SMITH, J.—Defendant J. S. Compton, Inc. owns land at the southwest outskirts of defendant City of West Des Moines (formerly Valley Junction). It comprises most of the north half of the northwest quarter of the section.

Interveners own an irregularly shaped tract of land (recently acquired from plaintiff Archer), the north approximately thirty-four acres of which lie immediately south of the east part of the Compton tract and in the southeast quarter of the northwest quarter of the section. The Jordan Road runs east and west along the line between these two tracts, turns southwest at the northwest corner of the Archer-Hall land (some four hundred fifty to five hundred feet east of the northwest corner of the "forty"), and extends thence southwesterly to and across the west line of the section, where it connects with a section-line highway running north. From the corner where said

road turns southwest the "Compton Lane" extends west along the south line of the Compton land to the west edge of the section, where it connects with the north-and-south section-line highway above mentioned.

Plaintiff Cook owns the remaining approximately six acres in the northwest corner of the above-mentioned "forty," immediately west of the Archer-Hall land, with the diagonal northeast-southwest Jordan Road along the line between them. The Cook land also lies immediately south of the Compton land, with the "Compton Lane" on the line between.

All these lands are in the Raccoon River bottoms and are quite flat but with a slope downward from the northeast corner of the Compton land, easterly and southeasterly, to a bayou of the Raccoon River some distance east and south. Farther south Jordan Creek flows southeasterly to said bayou, diagonally across the southwest quarter of the section and along the southwesterly side of the Archer-Hall land. The diagonal part of the Jordan Road is along the northwesterly side of the Archer-Hall land, which is bounded on the southeasterly side by the diagonal right of way of the Chicago, Rock Island & Pacific Railway Company (running southwest to northeast). Farther north it is bounded on the east side by the half-section line forming the east boundary of said southeast quarter of the northwest quarter of the section.

It seems undisputed that surface water draining from a watershed of approximately eight hundred acres lying to the northwest has always come down across the Compton land, crossing its north line near the northwest corner. In the course of time some sort of waterway formed, which some witnesses call a creek and some call a ditch. It runs southeasterly and now turns east near the south line of the Compton land and the north border of the Cook tract, continuing thence east immediately north of and parallel with the east-and-west part of the Jordan Highway. Some witnesses say it originally made the turn farther north and spread out across the middle of the Compton land and easterly to what is now the Penn Dixie Cement Corporation land, lying east of the Compton and Archer-Hall land.

About the year 1933 this ditch was dredged and cleaned

out and deepened by the WPA. The extent of this operation is in dispute, as is the question of whether the dirt was thrown up all on the east side or part on each side of the ditch. In 1938 Compton employed a construction company to use a dragline dredge to deepen and widen the ditch and to build up the embankment along its easterly side down to the turn east and thence along its north side to the east edge of the Compton land. This embankment is referred to in the pleadings as a dike. Plaintiffs and interveners claim it causes and has caused surface water to be thrown on their land in unnatural manner and quantity and they ask compensation for damage already suffered by reason of it and a mandatory injunction for its removal to prevent future damage.

The trial court awarded damages to plaintiffs and interveners against defendant J. S. Compton, Inc. and a decree of injunction against it and its officers. On appeal these defendants deny that plaintiffs and interveners have been or will be damaged by the dike, and they also urge estoppel, acquiescence, prescription, and the statute of limitations. Defendants Mildred Stevens and City of West Des Moines are not involved in the appeal.

▮ I. Perhaps the most difficult question is the one . of fact. Does the dike divert surface water to appellees' damage? There is conflicting testimony of lay witnesses and also the testimony and plats of engineers. The conflict in lay testimony may be due in part to the fact that different witnesses testify as to different occasions. Natural drainage conditions are not static. Nor is human memory infallible.

The plats and contour map show present conditions but we are compelled to rely largely on oral testimony in comparing the present with the past. The physical situation may be briefly described.

The natural draw through or along which the surface water drains from the eight-hundred-acre watershed already mentioned, entering the Compton land near its northwest corner, extends southeast approximately one fourth of the distance across the Compton land. The easterly side then falls away or flattens out to the east, the draw disappears, and the slope of the land becomes decidedly easterly.

This is shown by the contour map offered by appellants showing elevations taken in the fall of 1944. It tends to support the testimony already referred to as to the earlier destination of the surface water across the middle and east part of the Compton land.

This contour map shows that the bottom of the ditch descends toward the southeast with a drop of approximately eight feet from the north boundary of the Compton land to the point near the south edge where it turns east. The bottom of the ditch along this route is two or three feet lower than the surface of the land immediately west of the ditch. Along the same route the elevations of the top of the dike are shown to decrease much more gradually than does the bottom of the ditch, the drop over that distance being approximately four feet. The level of the land immediately east of the dike is five or six feet lower than the top of the dike along the entire route and consistently lower than the land lying immediately west of the ditch except for about the north fifteen rods. We are describing the conditions along the ditch and dike north of the point where they turn east near the south edge of the Compton land.

Most of the way the land immediately east of the dike is little higher than the bottom of the ditch. The conclusion seems inevitable that were it not for the dike much of the surface water, at least in time of flood, would not be carried by the ditch but would overflow the Compton land to the east. Instead it must now remain on the westerly side of the dike and continue down toward the land of plaintiffs and interveners. The testimony of plaintiffs' witnesses, and even of defendant Compton himself as to the situation before the dike was erected, confirms this conclusion. In fact, the frank purpose of the dike was to protect the Compton land in this way. Doubtless it was hoped the deepening and widening of the ditch would avert damage to the southward, but the evidence shows it did not.

The Compton Lane and the Jordan Road along the line between the Compton land on the north and the Cook and Archer-Hall land on the south are graded up to a height somewhat above the Compton land to the north but not as high as the dike nor high enough entirely to intercept and turn east-

ward the inevitable overflow caused by the retention of the flood-water on the west side of the dike. It seems part of this over-flow must break over the Compton Lane and the Jordan Road and upon the lands. of plaintiffs and interveners. The extent of this break-over, of course, varies from time to time and from season to season, depending on the amount of rainfall.

The testimony of eyewitnesses, though somewhat conflicting, supports the conclusion that this result occurs and that the dike does divert and has diverted the natural flow of surface water to the damage of plaintiffs and interveners. We shall not re-view the testimony in detail. Plaintiffs and interveners are en-titled to the injunction prayed for unless they have by acqui-escence, estoppel, or limitation lost that right.

The opinion in Keck v. Venghause, 127 Iowa 529, 103 N. W. 773, 4 Ann. Cas. 716, discusses the law applicable to facts closely analogous to the factual situation here, if it be assumed that the ditch was, prior to the erection of the dike, a natural watercourse entirely across the Compton land. That case holds (quoting the headnote, 127 Iowa 529), that "A riparian owner cannot lawfully embank against the natural overflow of an in-land stream, where the same will cause an increased volume of water to flow upon the land of another to his injury." The rule is designed to protect both dominant and servient estates from unlawful interference with natural drainage.

We are mindful of the fact that the Archer-Hall land has doubtless at times been flooded to some extent by overflow water from Jordan Creek to the south; also that before the erection of the dike it occasionally received floodwaters by natural drain-age from the north. But we are convinced the erection of the dike has caused additional damage as we have already pointed out.

■ II. Appellants argue that the dike was built without objection by and with the implied consent and acquiescence of the owners of the Cook and Archer-Hall land. We do not think the evidence supports this contention. Certainly there is no affirmative evidence of it except by lapse of time and we hold that is not sufficient under this record.

■ Appellants couple with their argument at this point a claim of prescriptive right to maintain the embankment based

on the statute of limitations. This, of course, refers to the ten-year limitation. Section 564.1, Code, 1946. Our decisions have always held this to be the applicable statute in cases of this kind. Thiessen v. Claussen, 135 Iowa 187, 112 N. W. 545; Matteson v. Tucker, 131 Iowa 511, 107 N. W. 600; Fennema v. Menninga, 236 Iowa 543, 19 N. W. 2d 689. The language in Thomas v. Cedar Falls, 223 Iowa 229 (at page 238), 272 N. W. 79, was doubtless inadvertent.

Appellants do not contend otherwise but assume the right, if any, to maintain injunction proceedings accrued in 1933 when the WPA first dredged the ditch. Again we must hold the record does not bear out their claim. The evidence is somewhat conflicting as to the effect of this WPA work upon the flow of surface or floodwater but we think what took place in 1933 can hardly be held to mark the commencement of the conditions complained of by plaintiffs and interveners. Defendant Compton disavows having initiated the WPA operations. The testimony tends to show that whatever embankment was then thrown up did not effectively block the eastward overflow of the floodwaters but that they broke through and over it in places.

In 1938, however, defendant Compton definitely went about the project of intercepting the flow of surface water over the eastern part of the Compton land. We think he intended that the widening and deepening of the ditch would adequately take care of the intercepted or diverted waters. It is not necessary to impute to him an intention of throwing them upon the land of his neighbors. But we have here not a question of intent but one of actual results.

The record does not show the actual date of commencement of the action but it is clear ten years had not elapsed from the time of erection of the dike complained of and the right to maintain injunction was not barred by lapse of time or by any laches, estoppel, or acquiescence.

III. The appellants further argue that the dike is a permanent structure and that the damage, "if any," was original and accrued more than five years before the commencement of the action. This assignment raises the one debatable and difficult proposition of law in the case.

The rule contended for is stated thus by appellants:

"Where damage is done by a permanent dam, dike or earthwork the injury occurs when it is built or when the first damage occurs therefrom, and the damage is original and no action may be maintained on account thereof after five years."

They cite: Powers v. City of Council Bluffs, 45 Iowa 652, 24 Am. Rep. 792; Stodghill v. C., B. & Q. R. Co., 53 Iowa 341, 5 N. W. 495; Peden v. Chicago, R. I. & P. Ry. Co., 73 Iowa 328, 35 N. W. 424, 5 Am. St. Rep. 680; Irvine v. City of Oelwein, 170 Iowa 653, 150 N. W. 674, L. R. A. 1916E, 990; McCormick v. Winters, 94 Iowa 82, 84, 85, 62 N. W. 655; Thomas v. Cedar Falls, supra (223 Iowa 229, at page 236, 272 N. W. 79).

The intervener-appellees state the rule thus:

"Where a dike or levee which diverts surface water onto the land of another is not a permanent structure, or where the injury resulting therefrom is of an intermittent or recurring character, the statute of limitations does not bar the recovery of damages which occur within the statutory period prior to commencement of suit."

They cite: Hughes v. Chicago, B. & Q. Ry. Co., 141 Iowa 273, 119 N. W. 924, 133 Am. St. Rep. 164; Harvey v. Mason City & Ft. D. R. Co., 129 Iowa 465, 105 N. W. 958, 3 L. R. A., N. S., 973, 113 Am. St. Rep. 483; Costello v. Pomeroy, 120 Iowa 213, 94 N. W. 490; Drake v. Chicago, R. I. & P. Ry. Co., 63 Iowa 302, 19 N. W. 215, 50 Am. Rep. 746; Geneser v. Healy, 124 Iowa 310, 100 N. W. 66; Ryan v. City of Emmetsburg, 232 Iowa 600, 4 N. W. 2d 435; Wesley v. City of Waterloo, 232 Iowa 1299, 8 N. W. 2d 430; City of Ottumwa v. Nicholson, 161 Iowa 473, 143 N. W. 439, L. R. A. 1916E, 983; Vogt v. City of Grinnell, 123 Iowa 332, 98 N. W. 782.

Plaintiff-appellees cite, also, Falcon v. Boyer, 157 Iowa 745, 142 N. W. 427, to the same proposition.

It will be seen that both statements of the rule beg the question of structural permanency. The appellees, however, inject another consideration, viz., the intermittent or recurring character of the injury. In other words, they argue that both the structure and the injury produced by it must be permanent

in order that the damage may be treated as original and single in applying the statute of limitations.

The cited decisions suggest still another consideration—the right of the injured party in certain cases to treat a permanent nuisance as a continuing one (Hollenbeck v. Marion, 116 Iowa 69, 89 N. W. 210) but not to treat a continuing nuisance as permanent. Ryan v. City of Emmetsburg, 232 Iowa 600, 4 N. W. 2d 435; Wesley v. City of Waterloo, 232 Iowa 1299, 8 N. W. 2d 430. It is probably impossible to reconcile all the language of the many decisions. It may be doubted whether a plaintiff would have a right to elect to treat a permanent nuisance as a continuing one to evade the bar of the statute of limitations. The Hollenbeck decision, supra, did not involve the statute, and even the question of whether recovery for one period of time would bar another action for subsequent damage is carefully avoided. In fact, the opinion says the defendant would have had the right to have the entire damage assessed on the theory of permanency of the nuisance. We cannot, however, disregard the language of our decisions that say the real test is character of the damage and not merely the permanence or impermanence of the physical structure that causes it.

Nor can it be claimed appellants have any right to treat the structure as permanent. Its erection was unauthorized and no right of eminent domain existed to add any appearance of permanence or any apparent intent of permanent maintenance.

But, after all, the important consideration here is the character of the injury inflicted upon plaintiffs and interveners.

In Hughes v. Chicago, B. &. Q. Ry. Co., supra, 141 Iowa 273, 277, 119 N. W. 924, 926, 133 Am. St. Rep. 164, it is said:

"We may say, however, that counsel for appellant makes the mistake of assuming that, because the structure in question, the railway embankment and bridges, may be considered of a permanent character, the injuries resulting to the plaintiff are therefore also original and permanent. But this does not follow. Referring to this very question in the Harvey case, we said that the term 'permanent,' as here used, 'has reference not alone to the character of the structure or thing which produces the alleged injury but also to the character of the injury produced

by it. In other words, the structure or thing producing the injury may be as permanent and enduring as the hand of man can make it; yet if the resulting injury be temporary or intermittent, depending on future conditions which may or may not arise, the damages are continuing, and successive actions will lie for successive injuries.' '' (The reference is to Harvey v. Mason City & Ft. D. R. Co., supra, 129 Iowa, at page 474, page 961 of 105 N. W., 3 L. R. A., N. S., 973, 113 Am. St. Rep. 483.)

In the Hughes case some emphasis is also placed on the fact that the structure complained of was not on plaintiff's land and he had a right to assume defendant would ''exercise the proper degree of care to avoid obstructing the flow of water to his injury. * * * Until the delayed floods had set back across the intervening land and invaded his premises, he had no legal right to complain * * *. The invasion of his premises was not permanent but temporary, and each recurring invasion was a new wrong for which a new action would lie.''

We find no repudiation of this reasoning in any subsequent case. In Irvine v. City of Oelwein, supra, the defendant city, without resorting to condemnation proceedings, built a dam across Otter Creek for the purpose of creating a permanent lake. The damage done to plaintiff's land was clearly permanent and not occasional or intermittent.

In Thomas v. Cedar Falls, supra, 223 Iowa 229, 236, 272 N. W. 79, 82, a somewhat similar legal situation was involved. The opinion refers to ''an apparent inconsistency in the decisions of this court'' and states the rule: ''* * * where the obstruction * * * is caused by permanent embankment, *and where the injuries resulting therefrom are apparent at the time of the construction * * * then the injuries are original * * *.''* (Italics supplied.)

We are mindful of the ''apparent inconsistency'' in our decisions on this subject above referred to. In the Harvey case, supra, 129 Iowa 465, 471, 105 N. W. 958, 960, 3 L. R. A., N. S., 973, 113 Am. St. Rep. 483, it is said ''there is perhaps no question of law not settled by statutory enactment upon which there exists a greater confusion of authorities.'' But we think it clear

in the instant case that the damages must be classed as continuing, not permanent, in character.

The ditch was probably adequate in ordinary times to carry the normal flow of water descending from the northwest, notwithstanding the dike that prevented it from spreading over the Compton land. But it was inadequate, at least in time of flood and high water. We think the trial court properly allowed damages for the five years immediately preceding the commencement of suit.

On appeal no question is made as to the amounts of damage allowed. We need devote no time to that question. It is apparent from what has been said that the decision of the trial court must be affirmed, and it is so ordered.—Affirmed.

OLIVER, C. J., and BLISS, HALE, GARFIELD, MANTZ, MULRONEY, and HAYS, JJ., concur.